# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

BRENDA L. GIEBEL,         )         CASE NO.  5:12-cv-750
                                         )
                                         )
            PLAINTIFF,      )         JUDGE SARA LIOI
                                         )
vs.                             )
                                       )         MEMORANDUM OPINION AND
                                       )         ORDER
DEVIN G. LAVALLEY, et al.,    )
                                       )
                                       )
           DEFENDANTS.    )

This matter is before the Court upon defendants' motion for partial summary judgment. (Doc. No. 64.) Plaintiff has filed a response in opposition (Doc. No. 76), and defendants have filed a reply (Doc. No. 92). Plaintiff then moved to strike defendants' reply or, in the alternative, to file a surreply. (Doc. No. 98.) Defendants filed a response to that motion (Doc. No. 100), and plaintiff filed a reply (Doc. No. 104). Plaintiff's motion to strike is **DENIED**. Additionally, having construed a portion of defendants' reply brief as a motion to strike certain testimony presented in the deposition and affidavit of one of plaintiff's experts, the Court granted plaintiff leave to respond and defendants leave to reply (Non-document Order, June 7, 2013), which they did (Doc. Nos. 99 and 101, respectively). Once again, plaintiff moved for leave to file a surreply with respect to the motion to strike (Doc. No. 102), and once again, that motion was denied (Non-document Order, June 20, 2013). For the following reasons, defendants' motion to strike, contained in their reply (Doc. No. 92) is **GRANTED**, and

defendants' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

This case was precipitated by a collision of a tractor trailer driven by defendant Devin Lavalley ("Lavalley") and owned and maintained by defendant Werner Enterprises, Inc. ("Werner") with the vehicle driven by plaintiff Brenda Giebel ("plaintiff" or "Ms. Giebel"). (Doc. No. 1, Compl., and Doc. No. 7, Answer, at ¶ 1.) Ms. Giebel was injured in the collision, but the severity of her injuries is hotly contested by the parties.

Ms. Giebel brought suit in this court against Lavalley, Werner, and Lavalley's employer, Drivers Management, LLC ("DML"). She alleges that Lavalley was negligent in operating the tractor trailer, that Werner and DML were negligent in hiring and supervising Lavalley, and that Werner and DML were negligent in maintaining both the tractor trailer in question and their fleet of vehicles generally.

Plaintiff offers substantial testimony as to the nature of the injuries she allegedly sustained in the accident. Her primary care physician, Dr. Eric Moyer, testified that she suffered from post-concussion syndrome, which "[h]as caused permanent mood disorder" in the form of chronic anxiety and depression. (Doc. No. 79 at 1316.) Dr. Moyer also agreed that plaintiff suffered from neck and back sprains, which were "[g]etting better slowly" (Doc. No. 79 at 1278), and that her symptoms were "moving away from physical sprain/strain types of complaints and . . . towards psychological, anxiety, depression type[sic] of issues" (Doc. No. 79 at 1281). However, Dr. Moyer also described plaintiff's pain as "chronic" and "not going towards going away." (Doc. No. 79 at 1299.)

Similarly, plaintiff's treating neurologist, Dr. Norman Lefkovitz, offered a medical opinion that the motor vehicle collision resulted in injuries to plaintiff including "chronic neck and low back pain" and restricted motion of her neck and back, which he believes are permanent. (Doc. No. 81 at 1909–13.) Dr. Lefkovitz also testified that plaintiff suffers from post-concussion syndrome, resulting in headaches, dizziness, and cognitive issues, such as problems with her memory and other aspects of intellectual functioning. (Doc. No. 81 at 1920–21.) He believes those symptoms are likely permanent. (Doc. No. 81 at 1921.) In addition, Dr. Lefkovitz indicated that plaintiff suffers from a permanent condition known as "fourth nerve palsy," an injury to a nerve that "innervate[s] the eye movements," resulting in double vision. (Doc. No. 81 at 1923–25.) He also examined a visual field test performed on plaintiff by a neuro-ophthalmologist and concluded that plaintiff is permanently impaired in the upper left portion of her visual field in both eyes. (Doc. No. 81 at 1926–27.) These visual impairments, Dr. Lefkovitz opined, could affect plaintiff's ability to read and drive. (Doc. No. 81 at 1928.)

Additionally, Ms. Giebel was examined by two neuropsychologists, Drs. Delphi Toth and John Kenny. Dr. Toth, plaintiff's treating neuropsychologist, evaluated plaintiff and diagnosed her with "Post-Concussion Syndrome from a Closed Head Injury, with permanent Organic Brain Damage[, and] . . . a prolonged Adjustment Disorder with significant Depression and Anxiety" as a result of the collision. (Doc. No. 86–1 at 2961.) Ms. Giebel indicated to Dr. Toth that she was experiencing irritability, problems sleeping, suicidal thoughts, and cognitive issues affecting her ability to speak and perform her job properly. (Doc. No. 86 at 2848–49.)

Dr. Kenny is an expert retained by the defendants. He averred that plaintiff's gait "was indicative of somebody who had a balance issue," and that she seemed "unstead[y]" on her

feet. (Doc. No. 82 at 2204–05.) Dr. Kenny also testified that balance issues are regulated by the cerebellum in the brain, and that plaintiff's cerebellum function was shown through testing to be moderately to severely impaired as a result of the automobile collision. (Doc. No. 82 at 2207–09.) According to Dr. Kenny, plaintiff's brain injury is classified as a "mild traumatic brain injury," or MBTI. (Doc. No. 82 at 2571.) Although he was engaged, in part, to determine if plaintiff was malingering, Dr. Kenny concluded that she was not, and that she was not exaggerating her physical pain. (Doc. No. 82 at 2221–26.) As an "alternative hypothesis" to malingering, Dr. Kenny posited a "somatoform disorder," based apparently on the belief that Ms. Giebel's symptoms were "far in excess of the kind of cognitive problems that you would see from somebody with even a severe brain injury." (Doc. No. 82 at 2551–53.) Further describing plaintiff's cognitive issues, Dr. Kenny determined that plaintiff had post-traumatic stress disorder, "a significant sustained attention problem," "comorbid depression," and was "reporting suicidal ideas." (Doc. No. 82 at 2485, 2551, 2566–67.)

## II. SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

The party opposing the motion may not rely merely on allegations or denials in its own pleading; rather, by affidavits or materials in the record, they must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Rule 56(c)(4) requires that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Mere conclusory allegations "are not evidence and are not adequate to oppose a motion for summary judgment." Miller *v. Aladdin Temp–Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to

overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

In ruling on a motion for summary judgment, the court may not take into account credibility or the weight of the evidence, nor may it draw inferences from the facts. *Anderson*, 477 U.S. at 255. "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* "If the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* at 248. Accordingly, for the purposes of deciding this motion, and where communicated properly under Rule 56, plaintiff's account of the facts must be accepted as true.

### III. DEFENDANTS' MOTION TO STRIKE

Plaintiff retained Dr. Jeffrey Liva to examine Werner's conduct related to the hiring and supervision of Lavalley. (Doc. No. 76-10 ¶ 4.) Dr. Liva was deposed by defendants on April 5, 2013. (Doc. No. 85.) Before the deposition concluded, Dr. Liva requested the opportunity to review the transcript and make any proper corrections. (Doc. No. 85 at 2709–10.) The transcript was completed on April 9, 2013, but Dr. Liva claims that he was not provided a copy at that time. On May 3, 2013, Dr. Liva purportedly notified plaintiff's counsel that he had yet to receive the transcript, and plaintiff's counsel promptly provided him with a copy. On May 17, 2013, Dr. Liva submitted 10 pages of errata, citing transcription errors, grammatical corrections, information recalled subsequent to the deposition, correction of misstatements, and numerous changes submitted for "clarification." (Doc. No. 85-1.)

**A. The Errata Sheet**

Defendants argued in their reply in support of partial summary judgment that certain of Dr. Liva's errata submissions should be stricken. (Doc. No. 92 at 4289–90.) The Court construed the argument as a motion to strike and granted the parties leave to complete briefing of the issue as such. To that end, plaintiff filed a response (Doc. No. 99), and defendants filed a reply (Doc. No. 101).

Federal Rule of Civil Procedure 30(e) outlines the process by which a deponent may alter his or her deposition testimony:

> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available[1] in which:
>
> > (A) to review the transcript or recording; and
> > (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1). The Sixth Circuit interprets Rule 30(e) to forbid "one to alter what was said under oath." *Trout v. FirstEnergy Generation Corp.*, 339 F. App'x 560, 565 (6th Cir. 2009) (quoting *Tuttle v. Tyco Elecs. Installation Servs., Inc.*, No. 2:06-cv-581, 2008 WL 343178, at *4 (S.D. Ohio Feb. 7, 2008)); *see also A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 702-03 (6th Cir. 2013) ("[A] party moving for summary judgment cannot extinguish a genuine issue of material fact simply by filing an errata sheet and affidavit to counteract the effect of previous deposition testimony."). If what were said under oath could be altered in an errata sheet, "one could merely answer the questions with no thought at all[], then return home and plan artful

---

[1] Although Dr. Liva does not claim that he was not *notified* by the court reporter that the transcript was available (just that he did not actually *receive* the transcript), defendants do not contest the timeliness of the submission of Dr. Liva's errata.

responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination." *Trout*, 339 F. App'x at 565 (quoting *Tuttle*, 2008 WL 343178, at *4). This is a restrictive approach; district courts within and without the circuit have recognized that "the Sixth Circuit is apparently the '[o]ne court of appeals [that] permits a defendant to correct only typographic and transcription errors." *Walker v. 9912 East Grand River Assocs., LP*, No. 11-12085, 2012 WL 1110005, at *3 (E.D. Mich. Apr. 3, 2012) (quoting *Devon Energy Corp. v. Westacott*, 2011 WL 1157334, at *4–6 (S.D. Tex. Mar. 24, 2011)). Accordingly, courts applying *Trout* have struck errata sheets when they attempt to make more significant alterations. *See CNB Bancshares, Inc. v. StoneCastle Secs. LLC*, No. 3:09-CV-33, 2012 WL 2887256, at *3 (E.D. Tenn. July 13, 2012); *EEOC v. Skanska USA Building, Inc.*, 278 F.R.D. 407, 412 (W.D. Tenn. 2012); *Walker*, 2012 WL 1110005, at *3–*4.[2]

The majority of the changes Dr. Liva requests in his errata sheet are on grounds of "clarification." That "clarification" often consists of the addition of whole sentences—sometimes even entire paragraphs—of testimony. This "take home test" approach is simply not proper in the Sixth Circuit. It is irrelevant whether the additional testimony is consistent or inconsistent with prior testimony: the only acceptable changes are those that correct either typographical or transcription errors. As a result, Dr. Liva's proposed changes for reasons of "clarification," "[information] recalled after [the] deposition," "[to] correct [a] misstatement," and "[to] correct

---

[2] Defendants discuss *Trout* and related cases in their briefing; plaintiff cites to pre-*Trout* district court cases that are diametrically opposed to the relevant language in *Trout*. Counsel "will be well served to remember their ongoing obligation to provide to the Court all relevant authority on an issue, for and against their stated position. While good faith efforts to distinguish a situation from those in which the law is well settled and efforts to evolve the law based on reason and experience are appreciated, attempts to blindside the Court through failure to bring relevant, binding, and instructive authority to the Court's attention are injurious to the administration of stare desisis." *Fieldturf, Inc. v. Southwest Recreational*, 212 F.R.D. 341, 344 n. 3 (E.D. Ky. 2003).

grammar" are improper and must be stricken. Where actually acknowledged as such by the court reporter,[3] the proposed changes corresponding to "transcription error[s]" are accepted. Defendants' motion to strike portions of Dr. Liva's errata sheet is **GRANTED**.

**2. The Affidavit**

As an exhibit to her opposition to defendants' motion, plaintiff submitted an eight-page affidavit from Dr. Liva. (Doc. No. 76-10.) Defendants acknowledge that Dr. Liva obtained additional medical records from Lavalley's psychiatric caregivers after his deposition and the preparation of his reports. Their only specific objection to the content of the affidavit relates to paragraph ten. There, Dr. Liva offers additional testimony regarding the drug screen performed on Lavalley prior to his re-hiring, concluding that the medical review officer's report shows that "an impermissible conflict of interest" exists between the medical review officer and the laboratory conducting the screen, which "renders the test result invalid." Defendants point to Dr. Liva's deposition testimony, where he indicates that "the only problem" with the report would be in the event that "[Lavalley] confirmed for amphetamines and [the report] was verified negative." (Doc. No. 85 at 2692–93.)

"A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 40 (6th Cir. 2009) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). Thus, when evaluating whether to strike portion of an affidavit submitted post-deposition, the court "must first determine whether

---

[3] The court reporter who transcribed Dr. Liva's deposition reviewed and responded to those changes submitted as "transcription errors." (Doc. No. 99-2.) She refused to change three of the submissions, on grounds that the changes differed from what Dr. Liva actually said at the deposition. Consistent with Sixth Circuit law, these three changes are not transcription or typographical errors, and they are also stricken.

the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). If so, then the contradictory affidavit testimony must be stricken, "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*

The Court agrees with defendants that paragraph ten of Dr. Liva's affidavit improperly contradicts his previous deposition testimony. In his deposition, Dr. Liva indicated that there were no problems with the form of the report, but he attempts in his affidavit to introduce an alleged "conflict of interest" stemming from the examiner's use of laboratory letterhead. Plaintiff tries to explain this away by pointing to deposition testimony from Dr. Liva to the effect that regulations exist requiring a separation between the medical review officer and the laboratory performing the drug test. Uttering that general proposition does not change the fact that Dr. Liva opined in his deposition that "[t]he rehire drug screen is not a problem as far as the report," and now claims in his affidavit that the report invalidates the drug screen. Moreover, plaintiff does not offer a justification for the contradiction. Thus, defendants' motion to strike paragraph ten of Dr. Liva's affidavit is **GRANTED**.

The Court also notes that Dr. Liva's affidavit is rife with inadmissible speculation and legal conclusions, presented in remarkably brazen fashion: indeed, many paragraphs consist of Dr. Liva quoting a regulation verbatim and remarking that the defendant(s) in question failed to satisfy its requirements. "'It is well settled that courts should disregard conclusions of law (or 'ultimate fact') found in affidavits' submitted for summary judgment." *Harrah's Entm't, Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004) (quoting *F.R.C. Int'l, Inc. v. United States,* 278 F.3d 641, 643 (6th Cir. 2002)). As defendants have not moved to strike any portion of

the affidavit other than paragraph ten, the Court will not take fine-toothed comb in hand and attempt to determine what can stay and what must go. However, where part of the affidavit is relied upon by plaintiff in an attempt to thwart summary judgment by showing the existence of a material issue of fact, the Court will evaluate the admissibility of the cited paragraph(s) accordingly. *See Hohenstein v. MGC Mortgage, Inc.*, 2:12-CV-46, 2013 WL 1399331, at *2 (S.D. Ohio Apr. 5, 2013) ("It does not ultimately matter whether this Court officially strikes the offending provisions because regardless of whether they are stricken, the Court will not accept as true such legal conclusions.") (citing *Harrah's*, 100 F. App'x at 394).

## IV. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants seek summary judgment on two issues: (1) whether Ms. Giebel's injuries are insufficient to lift the cap on non-economic damages pursuant to Ohio Rev. Code § 2315.18(B)(3); and (2) whether defendants' behavior was insufficiently egregious to allow Ms. Giebel to seek punitive damages at trial.

### A. Ohio's Cap on Compensatory Damages for Noneconomic Loss

Under Ohio law, a tort plaintiff may recover unlimited compensatory damages for noneconomic losses if the plaintiff has sustained either "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system," or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently

care for self and perform life-sustaining activities." R.C. § 2315.18(B)(3)(a)–(b). Otherwise, plaintiff's damages are limited as set forth in § 2315.18(B)(2).[4]

### 1. Case Law Related to the Cap on Damages

Case law interpreting § 2315.18(B)(3) is sparse, but several cases provide the Court with some guidance. First, in *Bransteter v. Moore*, No. 3:09 CV 2, 2009 WL 152317 (N.D. Ohio Jan. 21, 2009), a judge in this district examined whether a surgical scar was a "permanent and substantial physical deformity" under § 2315.18(B)(3)(a). The judge followed the reasoning of the Eastern District of Virginia in *Wilson v. United States*, 375 F. Supp. 2d 467, 471 (E.D. Va. 2005). There, the court examined a similar West Virginia statute as applied to a party with surgical scarring, holding that the "issue remains for resolution at trial." *Bransteter*, 2009 WL 152317, at *2 (quoting *Wilson*, 375 F. Supp. 2d at 472). Accordingly, the court in *Bransteter* stated that it would "resolve the issue following trial testimony. Defendants may move for a directed verdict; Plaintiff . . . may request a jury interrogatory." *Bransteter*, 2009 WL 152317, at *2.

In *Williams v. Bausch & Lomb Co.*, No. 2:08-cv-910, 2010 WL 2521753 (S.D. Ohio June 22, 2010), the court examined whether the plaintiff's "permanent loss of vision in her right eye, combined with poor vision in her left eye," constituted "the loss of a bodily organ system." *Id.* at *3. Applying definitions from a standard dictionary and a medical dictionary, the

---

[4] Section 2315.18(B)(2) reads:

> Except as otherwise provided in division (B)(3) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action under this section to recover damages for injury or loss to person or property shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.

court found that "the loss of vision in one eye does not result in the loss of a bodily organ system, if the other eye is functional." *Id.* at *4. Because the plaintiff had conceded that she had 20/70 vision in her left eye, the court found that she had not experienced "the loss of a bodily organ system" as a matter of law. *Id.* at *6.

Similarly, the court in *Williams* held that the plaintiff had not suffered a "permanent physical functional injury that permanently prevents [her] from being able to independently care for [her]self and perform life-sustaining activities." *Id.* The plaintiff had testified that she had a driver's license, subject to corrective lens and daytime driving restrictions, but that she had not driven since she was injured. *Id.* at *7. She also testified that she was "able to dress herself, brush her teeth, wash her hands, comb her hair, and walk without assistance." *Id.* Despite affidavits from the plaintiff and her husband stating that she could not independently care for herself, both plaintiff's affidavit and the testimony of her treating physician indicated that her vision in her left eye is 20/70 with corrective lenses. *Id.* The court found that "the only competent evidence relating to the permanency of the condition is the testimony of [plaintiff's treating physician]," who testified that she was not permanently prevented from independently caring for herself or performing life-sustaining activities. *Id.*

The one instance of an Ohio court applying § 2315.18(B)(3) to a plaintiff's injuries is *White v. Bannerman*, Nos. 2009CA00221, 245, and 268, 2010 WL 3852354 (Ohio Ct. App. 5th Dist. Sept. 27, 2010). The plaintiff in *White* was a 17 year-old who had suffered severe injuries in an automobile accident. She had to have surgery to remove glass from her hands and face, resulting in scarring, and several tendons in her hands had been severed, causing permanent numbness in her fingers and difficulty completing everyday tasks. *Id.* at *1–*2. Although

13

initially, "physicians were not sure if [she] would ever regain the use of her hands[,]" it appears physical therapy was at least partially successful in providing "limited mobility[.]" *Id.* at *1, *8. "Upon review of the evidence presented, including [plaintiff's] testimony of the substantial nature of the injuries to both her hands, photographs of her injuries, and the objective permanency thereof in appearance and function," the court ruled that plaintiff's injuries fit the exception to the damages cap under § 2315.18(B)(3). *Id.* at *9. It is not completely clear whether the court found plaintiff's damages to be a "permanent and substantial physical deformity" or a "permanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities," but the court's description of both the "appearance" and "function" of plaintiff's injuries suggests both.

The procedural posture of *White* is unusual. The plaintiff was initially granted a default judgment, and the court set a hearing on damages. *Id.* at *1. Afterward, the defendant moved to vacate the default judgment and for leave to file an answer, but was denied. *Id.* Next, the defendant requested a jury trial on damages, but that request was also denied. *Id.* All this led to the trial court hearing evidence on damages, along with averments from plaintiff's complaint, which were deemed admitted because of the defendant's previous failure to answer. *Id.* Thus, *White* does not stand for the proposition that the plaintiff's injuries excepted her from the damages cap as a matter of law, because the trial court was acting as fact-finder in a bench trial regarding the issue of damages subsequent to the defendant's default as to the issue of liability.

Next, in *Weldon v. Presley*, No. 1:10 CV 1077, 2011 WL 3749469 (N.D. Ohio Aug. 9, 2011), *report and recommendation adopted by* 2011 WL 3754661 (Aug. 9, 2011), the court was faced with a plaintiff who had suffered injuries to her head, neck, shoulders, and back,

as well as a four-centimeter surgical scar, as the result of an automobile accident. As a matter of Ohio law, the court ruled that plaintiff's scar was not a "substantial physical deformity" that would lift the damage cap. *Id.* at *7. The court also rejected the argument that a "deformity" could exist inside the plaintiff, relying on *Williams* in stating that "Ohio courts have interpreted 'permanent and substantial physical deformity' objectively." *Id.* at *6–*7. The court also distinguished Weldon's scar from "the multiple scarring at issue in *Bransteter* [and] the disfigurement of hands and face noted in *White*." *Id.* at *7. In addition, the court found that the plaintiff's inability to operate a vacuum, move furniture, and perform yard maintenance did not "prevent [plaintiff] from caring for herself." *Id.* at *8.

Last and most recent is the case of *Ohle v. DJO Inc.*, No. 1:09-cv-02794, 2012 WL 4505846 (N.D. Ohio Sept. 28, 2012), also out of this district. In *Ohle*, the plaintiff lost shoulder cartilage as a result of a pain pump installed to alleviate pain from an arthroscopic surgery. *Id.* at *1. Her condition worsened, and part of her humerus bone had to be sawn off in subsequent surgery and replaced with a metal prosthesis. *Id.* In total, the plaintiff claimed that her injuries consisted of: 1) loss of all or nearly all of her shoulder cartilage; 2) the replacement of her shoulder bone with a metal prosthesis; and 3) scarring, consisting of a larger scar stretching from her collarbone to her armpit and two smaller scars on the front of her shoulder. *Id.* at *2. The parties filed cross-motions for summary judgment on the issue of whether the plaintiff's injury was a "permanent and substantial physical deformity." *Id.* at *1–*2.

In evaluating the motions, the court ruled, first, that "[f]ederal courts in Ohio have consistently treated motions on the applicability of the noneconomic damages maximum as motions for summary judgment. In doing so, they have also held that whether a deformity is

sufficiently permanent and substantial should, once the plaintiff crosses an evidentiary threshold, be for the[] jury, not the court to decide." *Id.* at *3. The court cited *Branstetter*, *Williams*, and *Weldon* in support, and distinguished *White* because the court there was acting as the trier of fact in a bench trial. *Id.* Next, the court determined that plaintiff had provided sufficient evidence for the question to go to the jury, rejecting defendants' contention that, "as a matter of law, internal modifications of a person's body structure and surgical scars cannot qualify as permanent and substantial physical deformities." *Id.* at *4.

### 2. The Maximum Scope of Plaintiff's Injuries

Certainly, the nature and extent of Ms. Giebel's injuries are material and in dispute. However, taking plaintiff's account of the facts as true, the record contains competent testimony on her behalf of the following *permanent* conditions:

> Sprain/strain of the neck and lower back;
> Damage to the cerebellum portion of the brain;
> Other organic brain damage; and
> Damage to the optic nerve.

The effects of those injuries—again, all of which are attested to in the record as being permanent in nature—are:

> Pain and restricted motion of the neck and lower back;
> Issues resulting from post-concussion syndrome and/or brain damage, including headaches, dizziness, problems with balance, memory, and concentration, reduced intellectual efficiency, and other cognitive issues;
> Psychological issues, including severe anxiety, depression, and suicidal thoughts;
> Visual problems, including severe impairment of visual processing speed, double vision, and loss of vision in the upper-left quadrant of the visual field in both eyes.

Plaintiff and plaintiff's physicians also offer competent testimony that her injuries have affected her life activities in the following ways:

Inability to perform activities requiring "heavy use of her neck or arms, or bending or twisting," including carrying her children or other heavy objects, going to the grocery store, lifting heavy pots of food, running a vacuum cleaner, etc.;
Inability to lift over 25 pounds without pain;
Inability to work for more than four to six hours per day;
Forgetting things like paying bills and taking medicine;
Inability to drive;
Inability to ride as a passenger in a vehicle in certain situations; and
Difficulty reading.

Taking the evidence in a light most favorable to the plaintiff, defendants dispute whether such evidence justifies lifting the damage cap imposed by § 2315.18(B)(3).

### 3. Interpretation of § 2315.18(B)(3)

The terms in § 2315.18(B)(3) are not defined within the statute. The Court, then, must undertake the task of interpreting the statute and applying it to Ms. Giebel. "In matters of statutory interpretation, [courts] look first to the text and, if the meaning of the language is plain, then 'the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1106 (6th Cir. 2010) (quoting *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004)). "If the words are plain, they give meaning to the act, and it is neither the duty nor the privilege of the courts to enter speculative fields in search of a different meaning." *Roberts v. Hamer*, 655 F.3d 578, 583 (6th Cir. 2011) (quoting *Caminetti v. United States*, 242 U.S. 470, 490 (1917)). "Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Lockhart v. Napolitano*, 573 F.3d 251, 261 (6th Cir. 2009) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).

Plaintiff does not allege to have suffered "loss of use of a limb" or a "permanent and substantial physical deformity." Instead, she argues: that her partial loss of eyesight in both eyes constitutes "a loss of a bodily organ system," and that the totality of her injuries comprise a "[p]ermanent physical functional injury that permanently prevents [her] from being able to independently care for [her]self and perform life-sustaining activities."

*a. "Loss of a Bodily Organ System"*

Citing *Williams*, defendants contend that the damage to Ms. Giebel's eyesight cannot constitute a "loss of a bodily organ system." Ms. Giebel claims that *Williams* is not only distinguishable, but works in her favor, relying upon dicta where the court stated that "the loss of vision in one eye does not result in the loss of a bodily organ system, if the other eye is functional." 2010 WL 2521753, at *4.

The Court agrees with the statement in *Williams* that "the body's ocular system constitutes a bodily organ system" and consists of both eyes working in concert. *Id.* However, that does not mean, as plaintiff claims, that any amount of damage to the eyesight of both eyes is a "loss" of the ocular system. The dicta in *Williams* suggests merely that blindness in both eyes would merit lifting the cap. And there is nothing before the court, disputed or undisputed, that suggests plaintiff is legally blind in either eye, much less both eyes.[5] On the contrary, plaintiff has submitted substantial testimony that she has lost only her ability to see part of the upper-left quadrant of her visual field, not that she has lost her ability to see entirely. To be sure, evidence

---

[5] The only reference to blindness before the Court is testimony by a nurse who never physically examined Ms. Giebel that she is legally blind "as it relates to driving." (Doc. No. 66 at 322–25.) This is misleading. One can be denied a driver's license in Ohio if one's vision is worse than 20/70 or if one's visual field is not "at least seventy degrees on one side of fixation and forty-five degrees on the other side of fixation[.]" Ohio Admin. Code § 4501:1-1-20(C)(1)(c), (G)(3). To be considered legally blind, however, one must have vision worse than 20/200 in both eyes or a visual field restricted to 20 degrees. 42 U.S.C. §1382c(a)(2).

in the record indicates that Ms. Giebel's ocular system has been injured, but nothing suggests that the system has been "lost," as required by the statute to lift the damages cap. Indeed, all of the evidence regarding plaintiff's eyesight indicates that she continues to retain use of her ocular system. Accordingly, the Court finds as a matter of law that plaintiff has not suffered the "loss of a bodily organ system."

*b. "Being Able to Independently Care for Self and Perform Life-Sustaining Activities"*

Next, defendant contends that plaintiff has failed to demonstrate an issue of disputed material fact with respect to her purported inability to "independently care for [her]self and perform life-sustaining activities."

Some of plaintiff's limitations are similar to those of the plaintiff in *Weldon*. Both indicated an inability to perform certain activities around the house, namely those requiring movement of heavy objects. However, plaintiff's opposition brief misrepresents the nature of some of these restrictions. In the brief, she claims that she is unable to perform "such necessary and basic functions as buying groceries, washing [her] clothes, driving a car, maintaining a job and remembering to pay bills." (Doc. No. 76 at 666.) However, plaintiff herself testified that she can do laundry "as long as it is taken downstairs for [her]" (Doc. No. 80 at 1675) and that she can set up certain reminders and methods of payment to alleviate problems with remembering to pay bills (Doc. No. 80 at 1669). She does not claim to be unable to maintain a job, though she does state that her hours at her current job have been cut back to four hours per day, "with the exception that if [she's] feeling well [she] can go up to six." (Doc. No. 80 at 1537.) To be sure, some evidence in the record indicates that Ms. Giebel cannot drive, and that she has anxiety

issues with respect to being a passenger in a car as well, at least on expressways. But driving and riding in cars on expressways are not "life-sustaining" activities.

Plaintiff also contends that the emotional effects of her brain injury render her unable to perform life-sustaining activities. Specifically, she advances that "the inability to stop one's self from committing suicide is the most basic of all 'life-sustaining activities.'" (Doc. No. 76 at 666.) She also testified that her medication is stored somewhere unknown to her, and administered by her husband, out of fear that she will act on her suicidal impulses by intentionally overdosing. (Doc. No. 80 at 1686, 1698–1700.)

Defendants argue that this symptom is not a "physical functional" injury under the statute, but rather "emotional or psychological." (Doc. No. 92 at 4280.) But defendants conflate an effect of an injury with the injury itself. Plaintiff has raised a genuine issue of material fact as to whether she suffers from suicidal thoughts and impulses as a result of a brain injury. A brain injury, of course, is both "physical" and "functional." The Court is not presented with the question of whether depression with suicidal thoughts and impulses, either in and of itself, or as a reaction to an injury outside the brain, constitutes a "physical functional injury," and the Court expresses no opinion in that regard.

Other courts have determined that "[a] mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself." *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 168 (2d Cir. 2003). The Court agrees; however, to lift the damages cap, plaintiff's injury must also prevent her from "perform[ing] life-sustaining activities" in addition to preventing her from "independently caring for [her]self." Moreover, the Court is mindful of the basic principle of statutory construction favoring an interpretation giving

meaning to all parts of a statute. *See Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 333 (1938). Yet there seems to be no possible circumstance in which an injury could meet one of the two phrases but not the other. A person who is unable to "perform life-sustaining activities" is *ipso facto* unable to "independently care for [one]self." The converse is also true, because "independently car[ing] for [one]self" is a "life-sustaining activity."

In sum, there is no evidence in the record indicating that plaintiff has suffered a "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system" under § 2315.18(B)(3)(a). However, there is sufficient evidence in the record to create an issue of fact as to whether plaintiff has suffered a "[p]ermanent physical functional injury that permanently prevents [her] from being able to independently care for [her]self and perform life-sustaining activities" under § 2315.18(B)(3)(b). Defendants' motion for summary judgment on this issue is therefore **DENIED**.

**B. Punitive Damages**

Defendants also seek summary judgment that plaintiff may not recover punitive damages. Ohio Rev. Code § 2315.21(C)(1) provides that punitive or exemplary damages may not be recovered against a defendant unless the plaintiff can show that "[t]he actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, or that defendant as principal or master knowingly authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate." Here, the only language at issue is whether defendants acted with "malice."

The Ohio Supreme Court has defined the "malice" necessary to justify an award of punitive damages to be "(1) that state of mind under which a person's conduct is characterized

by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987). Here, plaintiff asserts that defendants' behavior meets the second definition, corresponding to "conscious disregard" malice.

In Ohio, "an award of punitive damages based on conscious disregard malice requires 'a positive element of conscious wrongdoing. This element has been termed conscious, deliberate or intentional. It requires the party to possess knowledge of the harm that might be caused by [its] behavior." *Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1243, 1247–48 (Ohio 1996) (quoting *Preston*, 512 N.E.2d at 1176). "Absent such proof of a defendant's *subjective* knowledge of the danger posed to another, a punitive damages claim against that defendant premised on the 'conscious disregard' theory of malice is not warranted." *Malone*, 659 N.E. 2d at 1248 (emphasis added).

### a. Defendant Lavalley

In their motion and reply, defendants contend that plaintiff has failed to present evidence of malice on behalf of any defendant, including Lavalley. But defendants ignore evidence in the record, including the testimony of Lavalley himself, that raise a genuine issue of material fact as to whether his actions were malicious.

Plaintiff has pointed to competent evidence in the record suggesting, among other things, that Lavalley: suffered from Attention Deficit Hyperactivity Disorder ("ADHD") since he was a child; experienced symptoms from ADHD that included being easily distracted, easily frustrated, inattentive, and impulsive; was prescribed medication to treat those issues; purposely withheld information about his ADHD and medication from the medical examiner in order to

receive certification to operate a commercial motor vehicle; and failed to take his prescribed medication for a prolonged period of time up to and including the day of the accident. The Court finds that this constitutes sufficient evidence that Lavalley acted with a conscious disregard for the rights and safety of others in a way that had a great probability of causing substantial harm, such that the issue of punitive damages may be submitted to the jury.

### b. Defendants Werner and DML[6]

Plaintiff claims that the following constitutes evidence that Werner acted maliciously: (1) Werner did not have a policy to ensure its drivers are medically qualified under the federal regulations, other than simply requiring that they pass a DOT physical at the time of initial hire, including nothing in place to make sure drivers who suffer a disqualifying event before their certificate expires do not continue to operate commercial vehicles; (2) the medical evaluation form does not conform with the instructions and form contained in the federal regulations; and (3) Werner did not require Lavalley to undergo another medical exam upon rehire.

49 C.F.R. § 391.41 establishes two requirements for a person to be deemed physically qualified to drive a motor vehicle: (1) they must meet the physical qualification standards in § 391.41(b); *and* (2) they must have complied with the medical examination requirements in § 391.43. Curiously, plaintiff takes issue with Werner's practice of delegating the medical examination to third-party examiners and relying upon the results of their examinations, but offers no evidence that this practice is unusual in the industry or otherwise

---

[6] Except where defendants note that Dr. Liva was engaged only to evaluate the behavior of defendant Werner, the parties otherwise discuss the punitive damages issue as if Werner and DML were one and the same, making no attempt to attribute individual evidence or testimony to one or the other. As a result, in order to evaluate the issue, the Court has no choice but to do likewise, and will use "Werner" in this section to refer to both Werner and DML.

improper. The regulation itself certainly contains nothing to suggest that Werner was required to have medical examiners on staff, rather than using qualified third-party medical practitioners.

Plaintiff also contends in her briefing that Werner has failed to "adopt *any* policy to ensure that its drivers are medically qualified to operate large commercial vehicles[.]" (Doc. No. 76 at 674.) But plaintiff readily cites to uncontroverted deposition testimony by Werner and DML's corporate representative, Jaime Maus, discussing how Werner "ensures that drivers who are hired on with the companies see a company-approved physician who conducts a DOT physical on that driver," and that "Werner's policy is the same as federal regulations, that that driver would complete and pass a DOT-approved physical." (Doc. No. 90 at 3953–55.) Plaintiff's real bone of contention appears to be that Werner does not have any additional policies or protocols directed at revealing information that prospective applicants have withheld from the medical examiner. Again, however, plaintiff offers no evidence or argument to support the idea that such an additional policy is required by the federal regulations or some other source of law, much less to support the notion that failure to implement such an additional policy constitutes the "conscious disregard for the rights and safety of others in a way that had a great probability of causing substantial harm" required for an assessment of punitive damages.

Plaintiff also cites to testimony by Dr. Liva to attempt to establish that "motor carriers have a *separate and ongoing* duty to monitor the health of their drivers regardless of the existence of an unexpired medical certificate." This claim, found in paragraph 28 of Dr. Liva's affidavit, is a legal conclusion unacceptable as evidence, as is Dr. Liva's extended discussion of how 49 C.F.R. § 391.65(c) is analogous to Werner's situation in re-hiring Lavalley and manifests

24

a duty incumbent upon Werner to re-examine him upon re-hire.[7] Plaintiff also cites to Dr. Liva's testimony for the proposition that "Werner had no basis to conclude that Lavalley remained qualified to drive a commercial vehicle," but plaintiff has offered no competent testimony or legal argument that Lavalley's prior certification was invalidated.

Next, plaintiff claims that the medical examination report used in Lavalley's explanation is "missing critical components required under § 391.43." (Doc. No. 76 at 675.) The parties do not dispute what was included in the report, only whether it was deficient as a matter of law. The parties' arguments center upon two components of the DOT Form (Doc. No. 76-11) that do not appear on the form used in Lavalley's evaluation (Doc. No. 64-2).

First, in a section entitled "MEDICAL EXAMINER'S COMMENTS ON HEALTH HISTORY," Werner's form states: "(The medical examiner must review and discuss any "YES" answers and potential hazards of medications including over-the-counter-medications, while driving.)"; the DOT Form contains that language, verbatim, as well as: "This discussion must be documented below." The form clearly shows, and plaintiff does not contest, that Lavalley answered "NO" to every question in the "HEALTH HISTORY" section. The medical examiner also wrote "No meds," which the parties agree represents that Lavalley did not disclose that he was taking any medication at the time. Undeterred, Dr. Liva testified that the medical examiner who examined Lavalley incorrectly failed to discuss Lavalley's "NO" answers with him. The plain language of both forms is obvious: the medical examiner is only required to discuss "YES" answers and document *that* discussion in the section in question. Regardless of

---

[7] Section 391.65(c), entitled "Drivers furnished by other motor carriers," allows a motor carrier to employ a driver not regularly employed by that carrier if the carrier that regularly employs the driver provides a certification that includes certain information.

Dr. Liva's testimony that "YES" means "NO," plaintiff has utterly failed to establish that use of this form constitutes "conscious disregard for the rights and safety of others."

The second alleged deficiency in Werner's form is its failure to include several pages of reference material, including the text of § 391.41 and a section entitled "Instructions to the Medical Examiner," which includes the Federal Motor Carrier Safety Regulations Advisory Criteria. Plaintiff claims the omission of the pages "was critical to Dr. Liva's opinion that Defendants' reliance on the certificate was reckless." Plaintiff cites to more paragraphs in Dr. Liva's affidavit, where he offers more legal conclusions that Werner's form fails to meet the requirements of the federal regulations and shows that Werner is indifferent to them. (Doc. No. 76-10 ¶¶ 25–27.) But Dr. Liva's opinion of what the regulations require is not admissible, nor are his ruminations on whether failure to meet those regulations would justify an award of punitive damages. Moreover, Dr. Liva's statement in paragraph 27 of his affidavit that "Werner ignored the fact that what was furnished to it was an abridged form which had been inadequately completed . . . ." is simply wrong. The omitted instructional pages did not require anything to be completed by the examining physician.

The record is completely devoid of any evidence that anyone other than Lavalley himself had knowledge of facts from which a fact finder might conclude that he posed a danger to others. There is nothing to suggest that Werner or DML had any knowledge of Lavalley's mental health condition or that either consciously disregarded the rights and safety of others that had a great probability of causing substantial harm. Nor is there evidence of a positive element of conscious wrongdoing by them. *See Preston*, 512 N.E.2d 1174. Accordingly, defendants Werner and DML are entitled to summary judgment on the issue of punitive damages.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. On the issue of the cap on noneconomic compensatory damages imposed by Ohio Rev. Code § 2315.18 (B)(3), defendants' motion is **DENIED**. On the issue of punitive damages, as it pertains to defendants Werner and DML, the motion is **GRANTED**, and, as it pertains to defendant Devin Lavalley, the motion is **DENIED**.

**IT IS SO ORDERED**.

Dated: December 31, 2013

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**